UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-CV-80403-CIV-HURLEY

LYDIA ADAMS, as Personal Representative of
THE ESTATE OF SETH ADAMS,

      Plaintiff,

vs.

MICHAEL M. CUSTER, individually and
RIC L. BRADSHAW in his official capacity as
Sheriff of Palm Beach County, Florida,

      Defendants.
_____/

## MEMORANDUM OPINION AND ORDER

Lydia Adams, acting as Personal Representative of the Estate of Seth Adams, has sued Sheriff Ric Bradshaw ("the Sheriff"), in his official capacity as Sheriff of Palm Beach County, and Sgt. Michael Custer ("Custer"), individually, for damages under 42 U.S.C. § 1983. Plaintiff alleges that Custer illegally detained her son, Seth Adams ("Adams"), and used excessive deadly force against him in violation of the Fourth Amendment. She also asserts that Custer was deliberately indifferent to her son's serious medical needs in violation of the Fourteenth Amendment (Counts 1, 2). Additionally, Plaintiff asserts state law tort claims (battery, negligence) against Custer and the Sheriff under Florida's wrongful death statute (Counts 3, 4).

The case is now before the Court on the Defendants' amended motions for summary judgment as to all claims [ECF Nos. 170, 171]. For reasons discussed below, the Court will grant the motions in part and deny the motions in part.

1

## I. FACTUAL BACKGROUND

### A. SGT. CUSTER'S DESCRIPTION

This case results from a two-person confrontation with only one survivor and, therefore, Custer is the primary source for describing what happened. He states that shortly after 11:00 p.m., on May 16, 2012, he backed his unmarked police SUV into the parking lot of the "One Stop Garden Shop," in Loxahatchee, Florida, and parked the vehicle facing west. (He either did not see or consciously disregarded a large sign stating, "NO PARKING 6 PM TO 6 AM VEHCILES WILL BE TOWED.") At the time, Custer was on duty as an undercover agent in a surveillance operation conducted by a Palm Beach County Sheriff Office (PBSO) tactical unit (TAC).[1] He was dressed in plain clothes, with no visible law enforcement identification. He remained seated in his vehicle with the motor running, tinted windows rolled up, and headlights off.

---

[1] While Custer contends he was on official duty, operating as the "take-away" agent in the surveillance operations of his TAC unit, the PBSO Tactical Operations Unit Surveillance Log [DE 95-3] does not include Custer's name as one of the officers "assigned to surveillance" on the night of the shooting. However, Plaintiff alleges in her complaint that Custer was acting in the course and scope of his employment at all relevant times, eliminating the need for further debate at this juncture on the significance of this piece of conflicting evidence as it relates to the issue of whether Custer was acting within the scope of his discretionary authority, for qualified immunity purposes, or within the course and scope of his employment, for sovereign immunity purposes.

At the same time, there is a suggestion in the record that Custer may have chosen this clandestine location as a meeting place for a romantic tryst with a co-worker. A third party, J. Mark Dugan, has testified by affidavit that Custer told him he was having a sexual relationship with another deputy and that he planned to meet her on the night Adams was shot [DE 98-1]. The deputy was deposed and denied any improper relationship with Custer or contact with him on the night of the shooting. The Sheriff's Department ordered DNA testing on Custer's clothing which revealed the presence of DNA from a third person – not Custer or Adams -- on Custer's pants near the zipper and waist button. Third-party DNA was also found on Custer's shirt collar. DNA testing was done on a swab taken from the deputy; although this did not positively link her to the DNA found on Custer's pants, DNA analysts could not rule her out as a contributor. Further, a photograph of the homicide scene shows a large puddle of condensation several feet in front of Custer's vehicle, similar in appearance to the pool of water which collected from the air conditioning system found underneath Custer's vehicle, suggesting the possible presence of another vehicle at the scene at or near the time of the incident.

While this evidence may be relevant to the extent it hints at the possibility of another person present at the scene – and a possible eye-witness to the Adams/Custer confrontation –the Court does not find it relevant to the "course and scope" issue which has been conceded by the allegations of the Plaintiff's complaint.

Approximately a half-hour later, Adams drove his blue Ford pick-up truck into the parking lot of the One Stop property. He parked parallel to Custer, facing east, approximately 10-15 feet away. According to Custer, Adams immediately began shouting profanities "as loud as a person could make their voice," screaming, "Who the f---- are you? ... What the f---- are you doing here?" After Custer identified himself as a deputy sheriff on a surveillance assignment "looking into a few things" in the area, Adams retorted, "I don't give a f--- or what the f--- you are doing here....You have no right to be here." Adams exited his truck, empty-handed, and advanced on Custer at a "rapid pace," prompting Custer to exit his vehicle. Custer grabbed his PBSO identification lanyard from the front seat of his vehicle and carried it out, holding it up to display to Adams as he again identified himself as an undercover police officer with the Palm Beach County Sheriff's Office (PBSO).

In his initial sworn statement, given to PBSO investigating officer Detective Chris Neuman, Custer claimed that a display of credentials "usually brings [a person] down a little bit," but in this case, "it didn't bring [Adams] down at all. It actually seemed to make him worse." [DE 202-3, page 9]. Custer said he told Adams not to advance, but at that point, "[t]he gap had been closed," and "out of nowhere ... [Adams] grabbed [him] by the throat." [DE 202-3, p. 5]. Custer initially described it as "a good grip" which lasted "a couple of seconds." In later deposition testimony, Custer said Adams grabbed him by the throat, using one hand, "as hard as a man could grab you" [DE 95-2, p. 21]. In his deposition, he further testified that he initially perceived Adams as "a lunatic," [DE 95-2, p. 20], but nevertheless decided to approach him – instead of leaving the property – because he thought Adams might have been a "decoy" for a group of burglary suspects who were under surveillance by his TAC unit in the area [DE 95-2, pp. 20-21].

Custer said he countered Adams' grab with an "arm sweep," allowing him to break free of Adams grip.  After a brief "grappling," Custer gave Adams a "sternum strike" which effectively "knock[ed] the wind" out of him, allowing Custer to withdraw and create a space between the two. At this point, Custer drew his firearm with his left hand and pointed it at Adams, ordering him to the ground and telling him he was under arrest (presumably for the crime of assaulting a police officer) [DE 95-2, p. 22, 24].  Although Custer saw nothing in Adams' hands, he stated he felt in fear of his life and decided to draw his weapon because of Adams' "overall aggression"  and "inability to de-escalate at all," commenting,  "I'm not going to fight him one on one by myself." [DE 95-2, p. 23].

Instead of obeying Custer's command, Adams "hovered" in front of Custer, less than five feet away, walking back and forth in a semi-circle, with his empty hands visible in front  [DE 95-2, p. 25].  Custer – with his gun still trained on Adams – backed up to his vehicle, retrieved his hand-held radio from the front seat and broadcast a request for back-up, saying "I need a unit at A Road and Okee" [DE 95-2, pp. 25, 30].  Custer continued to command Adams to get to the ground and warned him he would be shot if he advanced further [DE 95-2, p. 25].

In his initial sworn statement to PBSO investigating officer Neuman, Custer said Adams ignored this command and "made a movement for the car." [DE 202-3, p. 6].  As Adams "kind of was going into the car," Custer "literally kicked the door shut," effectively "pinning" Adams between the door and truck frame.  Adams "was moving around" as Custer held him there, "trying to get out of the door," giving Custer the "perception" that Adams was "trying to get a weapon."  [DE 202-3, p. 6].  In this initial statement, Custer said it was at this point, when he "had [Adams] caught kind of in ...between the door and the car," that he "saw [Adams] arms coming around," and he began to fire, discharging three or four rounds [DE 202-3, p. 6-7].

4

In later deposition testimony, Custer elaborated on what precipitated his gunfire, saying he first noticed Adams "look[ing] over his shoulder towards his – the open door of truck," prompting Custer to warn him to keep away from the truck or be shot. [DE 95-2, p. 25]. He also testified at deposition that he saw Adams "in the truck fishing around" as he held him pinned between the truck frame and car door for a period of about 10 to 15 seconds. Custer said that he held his gun in his left hand during this struggle, while he wrapped his right arm around Adams' head and neck area, trying to pull him away from the vehicle. [DE 95-2, p. 26]. Custer maintains he yelled "Stop resisting, stop resisting; you're going to get shot, you're going to get shot; let me see your hands, let me see your hands" during this struggle [DE 95-2, p. 26]. Custer testified it was at that moment that "[Adams] yelled out, f---- you, as loud as he could, and came spinning around out of the truck," disengaging Custer's hold on him [DE 95-2, pp. 26-27]. Adams was standing in between the driver's side door and vehicle frame, still moving and "spinning around," when Custer then fired his first shot. [DE 95-2, p. 27].

Custer fired three more shots in rapid succession as he backed away [DE 95-2, pp. 27-28]. Unsure if he had hit Adams, Custer took cover by crouching behind the rear panel of his vehicle. From this vantage point, Custer saw Adams run directly from the door area of his truck, around the front of Adams' vehicle and then out through a nearby gate, disappearing "into the darkness"[2] [DE 95-2, p. 29]. Custer did not recall seeing Adams standing at or near the left rear tire of the truck at any point during this encounter [DE 95-2, p. 30].

---

[2] After he was shot, Adams used his cell phone to make two calls for help. The first, at 11:41 p.m., lasted 45 seconds; the second, at 11:42 p.m., lasted 34 seconds. Both calls were directed to Adams' brother and sister-in-law. The record is unclear as to whether Adams made these calls from the parking lot, before he collapsed, or from the nursery, after he collapsed.

At 11:41 p.m., Custer broadcast a second call – "shots fired"-- followed by a third transmission at 11:42 p.m. -- "Shots fired; white male ran inside, came at me and attacked me," and a final transmission at 11:43 p.m. -- "He is hit. I need EMS" [DE 95-2, pp. 30-31]. Custer testified that he made the final call requesting emergency medical services because he could see blood splatters in front of Adams' truck. [DE 95-2, p. 31]. Custer remained behind his vehicle while he waited for relief.

Within minutes, a back-up team from the TAC unit arrived. Following the blood trail, agents discovered Adams, collapsed in the darkened nursery grounds approximately 250-300 feet beyond the gate entrance.  One of the agents, Officer Schumm, removed his t-shirt and used it to apply pressure to Adams' wounds until the medics arrived. Adams was immediately air-lifted by Trauma Hawk to a local hospital where he died the next morning.

### B. EVIDENCE FROM OTHER SOURCES

On May 16, 2012, Seth Adams was 24 years of age.  He was 6' 2" feet tall and weighed 204 lbs. [DE 96-11, p. 5]. Custer was 5'8" and weighed approximately 200 lbs. [DE 66-1, p. 10].

Adams' blood alcohol content, derived from a blood draw at St. Mary's Hospital, was .131 [DE 96-11, p. 23].  He was wearing a work shirt with the "One Stop" company logo on the front and back. He both lived and worked on the "One Stop" nursery property.

Agent Kevin Drummond, another member of the TAC Unit, drove by and made a U-turn in front of the One Stop parking lot during the encounter between Custer and Adams. Drummond's headlights swept over the parking lot, allowing him to observe Custer exiting his vehicle and Adams standing still between the two vehicles, near the driver's side front quarter panel of Adams' truck. Drummond did not stop as "[i]t didn't appear that there was anything wrong." As observed by

Drummond, it appeared that Custer was talking to Adams as he got out of his car, and Adams was standing there looking at him. Drummond saw no indication of any menacing gestures or screaming, or any sign of conflict [Deposition of Drummond: DE 96-7, pp.12-13]. Approximately 90 seconds later, as he drove eastbound on Okeechobee Blvd and turned south on B Road, he heard a "distressed" Custer calling for a back-up unit at A Road and Okee [DE 96-7, p. 14]. Drummond immediately stopped his vehicle, backed out onto Okeechobee Blvd., and drove back to the One Stop parking lot [DE 96-7, p. 14]. [3] He also heard Agent Schumm broadcast a warning to the effect of, "Boys, I just heard shots fired in the area. Just be careful," moments *before* he heard Custer's first call for back-up — a call which notably made no mention of a shooting [DE 96-7, p. 15].

Mary Bains, a forensic examiner called to the scene, examined and photographed Custer's neck and throat area, which Custer claimed had been grabbed "as hard as a man can grab you." Her photographs showed no redness or bruising or other marks on Custer's neck [DE 95-8, p. 2] [DE 96-1, pp. 11-12]. A swab of Custer's neck, analyzed by PBSO forensic scientist Tara Sessa, revealed a trace amount of DNA which came from someone else. Sessa was unable to determine what biologic substance the trace may have come from, noting that the specific test result for Seth Adams was "inconclusive" [DE 96-8, pp.25-27, 30].

Ballistic evidence indicates that Custer's first shot pierced Adams' right forearm, fracturing bone, before exiting at the wrist and grazing his abdomen. The entrance wound on Adams' forearm shows stippling from gun powder residue, a physical finding which all experts agree is indicative of a

---

[3] In Custer's deposition testimony, he acknowledges he heard "after the fact" that Sgt. Drummond was in the area and observed him talking to Adams at this juncture of the encounter. Although in his 5-18-12 sworn statement he consistently maintained that an enraged Adams was screaming at him throughout the entire encounter, in his 9-29-14 deposition testimony, he acknowledged he was able to "briefly" have a civil conversation with Adams, agreeing the exchange was initially "congenial" when he was explaining who he was and what he was doing on the property, at which point "for a couple of seconds, [Adams] sat there listening to me" DE 95-2, p. 23].

shot taken at close range, approximately one to two feet from the body. A bullet with imbedded bone fragment was found several feet *behind* Adams' pick-up, the resting place of which is marked as "stanchion 6" on the forensic examiner's report [Deposition of Peter Barnett: DE 174-3, p. 17]. A bullet "petal" found in Adams' forearm, extracted by the medical examiner, exactly matches a missing petal from the bullet found at "stanchion 6," linking this projectile to Adams' forearm/wrist wounds. The presence of bone fragment also links it to the forearm/wrist shot, the only one which fractured bone. There is no evidence that this bullet, or any other, truck Adams' struck causing it to ricochet or alter its course [Deposition of Chris Neuman: DE 95-5, p.17].

Blood stain evidence photographed and videotaped at the scene further shows that a blood trail originated between the two vehicles and behind Adams' truck, not inside the front door of the truck [Deposition of James Born: DE 95-16, pp. 66-67] [Deposition of PBSO CSI Julian Brandt: DE 174-2, pp. 16-17]. The beginning of the blood trail is found in a straight trajectory from the projectile marked at "stanchion 6" [Deposition of Peter Barnett: DE 174-3, pp. 22-23].

A defense forensic expert examining blood found on the cuff of Custer's jeans opined this was "satellite splatter" from blood was dripping onto the ground, splashing upward and outward onto Custer's pants when he stood within 12 inches of Adams' body [Deposition of Stuart James: DE 95-17, p. 15-16].

## C. OFFICIAL INVESTIGATIONS

The PBSO ordered a criminal and an internal affairs investigation into the shooting death of Adams. Sgt. Richard McAfee was in charge of the criminal investigation, and Sgt. Brett Combs headed up the internal affairs investigation. Sgt. McAfee assigned Detective Chris Neuman, of the PBSO Violent Crimes Division, as lead detective to investigate the homicide.

Neuman arrived at the crime scene at 11:50 p.m. and was initially briefed by Sgt. McAfee, who relayed Custer's immediate explanation of the shooting, i.e. that Custer was parked in the One Stop lot when Adams returned home, confronted Custer and then "battered him forcing him to fire his duty weapon." Other TAC agents interviewed by Neuman, specifically Agent Zuccarro, similarly reported that on their arrival Custer told him that Adams had attacked him, causing him to shoot.

In Neuman's initial tour of the scene, at approximately 12:50 a.m., he found "a pool of blood … on the ground near the rear driver's side tire" of the Adams' vehicle, as well as "blood …on the rear driver's side corner panel" [DE 96-3, p. 2]. His report makes no mention of blood splatter found on or near the driver's side door of Adams' truck. The report of lead crime scene investigator, Mary Bains, in contrast, notes "areas of BLS (blood like stains) on the driver's side of the [Adams' vehicle] (front quarter panel, door, front wheel, rear quarter panel, and rear tire)." Finally, Detective Neuman reported finding a blood trail "start[ing] on the driver's side of [Adams] truck" and continuing into the enclosed property for approximately 150-200 feet.

Notably, Detective Neuman described Adams' vehicle as "A 1992 BLUE 2 DOOR FORD RANGER WITH FLORIDA TAG," noting "BOTH DOORS WERE *CLOSED* AND THE DRIVER'S WINDOW OF THE TRUCK WAS DOWN"  [DE 96-3, p. 2] [Emphasis supplied]. Bains did not similarly describe the configuration of the Ranger doors, but she did direct the placement of collision wrap over the open window of the Ranger, the sealing of the vehicle with evidence tape, and delivery of the vehicle the PBSO crime scene garage [DE 95-8, p.2].

Finally, Neuman found Custer's black cell phone clip, along with a spent shell casing, on the ground near the driver's door of Adams truck. He found Adams' cell phone "on the passenger side of the truck." This account mirrors the observation of CSI Mary Bains, who similarly reported finding

Adams' red Blackberry Curve cell phone "on the ground to the south of the Ranger." [4]

Neuman did not interview Custer or take a formal statement from him at the scene, nor did he ask Custer to perform a re-enactment video at the scene. Two days later, on May 18, 2012, Neuman took a formal statement from Custer at the Sheriff's Office with Custer's attorney, Rick King, present. In this statement, Custer acknowledged he did not see anything in Adams' hands as he came "spinning" out of the truck, and explained his decision to use deadly force as follows:

> ...based on the events with him trying to choke me, his, his repeated refusal to succumb come to (sic), you know, my commands that he was under arrest, I was very, very fearful that he was – he was intense on harming me, killing me. I was very, very scared for my life and felt it necessary to utilize deadly force....

[DE 202-3, p. 9]. [5]

---

[4] Neuman's and Bains' report on this point is at odds with the two affidavits submitted in support of the PBSO application for a search warrant of the Adams' residence. These affidavits, authored by detectives Christopher Farron and Iris Reyes, report that Adams' brother and sister-in law, David and Raina Adams, reported finding Adams collapsed outside of their residence "with his cellular phone in hand." [DE 202-1, p. 5; DE 202-2, p. 4].

[5] This description, focusing on the alleged physical attack as the precipitation for gunfire, also mirrors the information relayed by Custer to Sgt. Combs, heading up in the internal affairs investigation. Sgt. Combs' "Use of Force report" dated 6/5/12 describes the use of deadly force as Custer's reaction to "Adams grab[bing] Sergeant Custer by the throat area." Although Custer was "able to use his hands to break Mr. Adams' hold," he said the "confrontation continued leading Sergeant Custer, in fear for his life, to discharge his duty firearm four times...." [DE 175-14]. Notably absent in either Sgt. Comb's "Use of Force" report or Custer's initial sworn statement to Det. Neuman is any mention of Adams making any furtive "fishing" movements inside the passenger compartment of his truck after Custer allegedly told him he was under arrest and commanded him to get on the ground.

The suggestion that shots were fired after Custer pinned Adams between the vehicle door, while Adams was "reaching" in his truck first came up in "follow-up" questioning by Custer's attorney at the conclusion of Det. Neuman's 5-18-12 sworn interview of Custer. At that time, Custer's counsel asked Custer if he was able to see in the truck "when [Adams] was inside the car reaching into the car" [DE 202-3, p. 9]. Custer answered "no."

The reference to Adams' "fishing around" inside his truck first appears in deposition testimony taken September 29, 2014; in that testimony, Custer said he saw Adams looking at his truck, after their initial scuffle, prompting Custer to warn Adams not to go near the truck or be shot. Custer said he then kicked the driver door shut "hard" on Adams, catching him "in between the truck and the door;" at which point he said Adams "was fishing ... [h]e was in the truck fishing around." Custer said he became "fearful for [his] life" at this point, causing him to discharge his firearm when Adams suddenly spun around toward him [DE 95-2, p. 27].

Sgt. McAfee did not order the seizure of Custer's work cell phone into evidence; to the contrary, upon inquiry from lead crime scene investigator, Mary Bains, he affirmatively told Bains not to take Custer's phone. Crime scene investigators did take Custer's clothing, minus his boots, into evidence, as well as Adams' clothing, Adams' cell phone and two computers seized from Adams' home.

The PBSO criminal investigation concluded with a determination that the Adams' shooting was a "justifiable homicide." The Internal Affairs Department similarly found no departure from department operating policies or procedures in Custer's use of deadly force.

## D. FACTUAL CONFLICTS

For summary judgment purposes, the question is whether there are genuine issues of material fact sufficient to call into question Sgt. Custer's version of the incident, i.e. that he shot Adams as Adams stood pinned between the door and frame of his vehicle, after Adams tried to choke him and refused to follow Custer's commands to get on the ground, and instead, persisted in reaching into his vehicle looking for what Custer feared might be a weapon. The court concludes that the record, as it stands today, and viewed in its totality, contains genuine issues of material fact pertaining to the circumstances confronting Sgt. Custer on the night of the shooting.

To begin with, the record reveals a minor, but nonetheless significant, modification in Custer's description of his initial encounter with Adams. Initially, Custer claimed that Adams was hostile and aggressive from the outset and became even more so after Custer identified himself as a law enforcement officer. He claimed that Adams continued screaming and "acting like a lunatic." Later, after Custer had become aware of Agent's Drummond's observations of Custer's and Adams' interaction (Custer and Adams talking peaceably), Custer acknowledged there had been a few

minutes interlude of civil discussion.

The record also reveals other subtle evolutions in Custer's description of the event over time which, while certainly not determinative standing alone, could in combination with the forensic evidence lead a jury to question Custer's credibility on the primary factual debate underpinning this controversy.   For example, in Custer's initial recounting of the event to first responders, as summarized by Det. Neuman, Custer said Adams had "battered" him, "forcing him to fire his duty weapon."  Similarly, in his second radio broadcasts for back- up help, at 11:42 p.m., Custer said, "Shots fired; white male ran inside, came at me and attacked me at one point."

The "use of force" report authored by Sgt. Combs also cites Adams'  physical attack on Custer as the sole precipitator of Custer's use of deadly force  [DE 175-14, p. 1]["Mr. Adams grabbed Sergeant Custer by the throat area.  Sergeant Custer was able to use his hands to break Mr. Adams' hold.  The confrontation continued leading Sergeant Custer, in fear for his life, to discharge his duty firearm four times....."].  Yet again, in affidavits dated  May 17, 2012, prepared in the early morning hours after the shooting in support of an application for a search warrant of the Adams' residence -- presumably based on immediate information supplied by Custer on the scene -- PBSO detectives Iris Reyes and Christopher Farron describe the "choking" incident as the sole precipitation for Custer's use of force against Adams – with no mention of any furtive movements or perceived attempts by a non-compliant Adams to retrieve a weapon from his vehicle:

> Sgt. Custer identified himself to Seth Adams as a Deputy Sheriff, repeatedly.  Seth Adams then began to attack Sgt. Custer and started choking him.  Sgt. Custer broke free from Seth Adams' hold and pulled out his department issued handgun.  Sgt. Custer discharged his firearm four times at Seth Adams striking him three times in the chest.  Seth Adams ran away from Sgt. Custer after the shots were fired and into the property which was 1950 A Road, Loxahatchee.

[DE 202-1, p. 5; DE 202-2, 4].

In a sworn statement given in the presence of his attorney on May 18, 2012, however, Custer testified that he became fearful for his life, causing him to shoot, when Adams, whom he had "pinned" or "caught" between the driver's side door and vehicle frame with his foot pressed to the door, broke free and spun around toward him with his arm raised [DE 202-3, p 6-7]. [6] In deposition testimony given two years later, Custer introduced the concept that he saw Adams "fishing around" inside his vehicle during the 5 to 10 seconds he had him pinned between the driver's side door and vehicle frame, and claimed that he took his first shot when Adams broke free of his hold and he suddenly came "spinning" around toward him at that specific location [DE 95-2, pp. 26-27].

While there may be several explanations for the development in Custer's description of the precise conduct precipitating the gunfire, it is yet one additional factor for consideration by a jury in assessing Custer's credibility as it relates to the factual circumstances confronting him which allegedly gave rise to and justified his use of deadly force.[7] That is, Custer's variations in the recounting of the shooting create an issue of credibility going to the weight of Custer's testimony, and would entitle a jury to reject it.

Portions of Custer's testimony are also inconsistent with that of other agents at the scene. For example, Agent Drummond testified he heard a cautionary "shots fired" radio broadcast from

---

[6] In his sworn statement to the Det. Neuman, given May 18, 2012 [DE202-3, p. 9], Custer said he made the decision to use deadly force as he held a struggling Adams pinned between the driver's side door and vehicle frame, "trying to get out of the door," when he "saw his arms coming around" toward him. For a "few seconds" he was very , very convinced [Adams] had obtained a weapon, a firearm or anything else" from the vehicle discharged his firearm as he "saw his arms coming round." He concluded:

> [B]ased on the events with him trying to choke me, his, his repeated refusal to succumb come to (sic), you know, my commands that he was under arrest, I was very, very fearful that he was – he was intense on harming me, killing me. I was very, very scared for my life and felt it necessary to utilize deadly force....

[7] See e.g. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234 (11th Cir. 2003). *Cf. Lane v. Celotex Corp.*, 782 F.2d 1526 (11th Cir. 1986); *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 521 (7th Cir. 1988).

Agent Schumm, moments *before* he heard Custer broadcast his first request for back up – testimony which is at complete odds with Custer's claim that he made his initial back up request while he had Adams held at gunpoint in front of him – before Adams allegedly ran toward his vehicle and became pinned inside the driver's side door.

Further, there is photographic evidence which calls into question Custer's claim that Adams grabbed him by the throat "as hard as a man could grab you." The photographs of Custer's neck taken at the scene by PBSO crime scene investigator Mary Bains showed no sign of redness, bruising or other marks on Custer's neck, and a DNA swab of Custer's neck revealed a trace amount of someone else's DNA, but it was "inconclusive" as to Adams, and could have been the result of blood splatter or saliva.

Detective Neuman's description of Adams' pick-up with "both doors...closed" in the immediate aftermath of the shooting also raises some question on the reliability of Custer's account. There is no testimony from Custer that he pushed the door closed after the shooting. While Agent Zuccaro, a first responder to Custer's call for back-up, told Det. Neuman that he "clear[ed] the black truck [Adams vehicle] for other threats" before positioning himself on the One Stop property, there is no evidence that he or any other officer altered the configuration of Adams' truck in any way before PBSO criminal investigators arrived and began recording evidence found at the scene. This physical evidence regarding the configuration of the driver's side door of Adams' truck – i.e. as "closed" – may have some explanation, but, standing alone as it does in the current summary judgment record, does create some conflict with Custer's description of Adams' alleged "spinning" out and "pushing open" of the driver's side door at the point of initial gunfire.

In addition to these shifts in Custer's description of the events leading up to the shooting, and certain inconsistencies between his deposition testimony and that of first responders, the record contains physical evidence which is reasonably interpreted to support a very different version of the event. Thus, in disputing Custer's account, the Plaintiff relies primarily on forensic blood and ballistic evidence to substantiate her contention that there is at least a genuine issue of disputed fact on the question of where Adams was standing at the time Custer first fired. The court agrees that this physical evidence supports a reasonable, contrary inference that Adams was not standing in or near the driver's side door of his vehicle at the time of Custer's first shot, but rather was standing empty-handed and unarmed behind his vehicle, in a position posing no immediate threat of serious bodily harm to Custer.

Specifically, blood splatter evidence on the truck, blood trail evidence on the ground, and ballistic evidence recovered by crime scene investigators comprise a body of physical evidence which supports a reconstruction of the event placing Adams behind or near the rear wheel tire of his pick-up truck at the time of the first shot. For example, the spent projectile found at stanchion "six" (containing imbedded bone fragment), located several feet behind Adams' truck, is consistent with a forensic reconstruction placing Adams behind his vehicle – with nothing to impede the bullet trajectory --at the time of Custer's first shot. Such a trajectory is also inconsistent with the notion, advanced by Custer, that Adams was first shot standing in between the driver-side door and vehicle frame, where absorption or ricochet off the vehicle frame would likely have created a different trajectory.

Forensic evidence also shows that bullets from the second and third shots pierced Adams' chest, entering his left rib cage and perforating his right lung, liver, stomach and spleen. Given the

15

disparity in height between two men -- with Custer standing at approximately 5'8' and Adams at approximately 6'2"-- and the internal lodging points of these bullets, a jury could conclude that Adams was hunched over, bent at the waist, when the second and third shots were fired, paused at the point of origin of the blood trail.   Plaintiff has also adduced expert testimony identifying the pool of blood found near the right rear wheel of Adams' pick-up truck as the point of origin for Adams' blood trail. This evidence, together with blood splatter found on the rear panel of Adams' vehicle, is also consistent with the view that Adams was standing behind or near the right rear wheel of his vehicle at the time Custer fired his first shot.

Custer's claim that he fired his first shot after Adams – standing   pinned   between the driver's side door and vehicle frame, "fishing around" inside --- suddenly broke free from Custer's chokehold and spun around shouting obscenities, is thus at complete odds with forensic blood and ballistic evidence which is reasonably susceptible of the conclusion that Adams was standing behind or near the driver-side, rear tire of his truck at the time of the first shot.

In sum, the record evidence as a whole, viewed in the light most favorable to the plaintiff, is reasonably susceptible to the following inferences: (1) Adams did not grab Custer by the throat or otherwise commit a forcible battery on his person prior to the shooting, and (2) Adams was standing, unarmed and empty-handed, behind or near the rear driver-side tire of his pick-up truck at the time Custer fired his first shot, well beyond the reach of any interior compartment of the vehicle.

Defendants assert these are not reasonable inferences, and that plaintiff's hypothetical reconstruction is entitled to no credit for summary judgment purposes because it is based on the speculative assumption that wounds from the first gunshot caused immediate bleeding which collected on the ground beneath Adams at the point of impact.   Defendants contend there is no

expert medical evidence to support this assumption, and that it is just as plausible Adams was shot while lodged between the driver door and truck frame – as contended by Custer -- then then staggered back and forth toward the left rear wheel of his vehicle (where a pool of blood collected as he paused), creating a single track of blood as Adams "doubled back" over the same ground toward the driver's side door.

However, it is for the jury, not the court, to weigh all the evidence and choose between competing inferences.  It is sufficient, for summary judgment purposes, that the evidence supports a reasonable inference that Adams did not grab Sgt. Custer's neck during the confrontation, and that Sgt. Custer fired at an unarmed, empty-handed Adams standing behind or near the left rear wheel of the pick-up truck.

## II. PROCEDURAL HISTORY: CLAIMS AND DEFENSES

Lydia Adams, as Personal Representative of the Estate of her son, Seth Adams, filed the instant § 1983 action against Sheriff Bradshaw, in his official capacity, and Sgt. Michael Custer, in his individual capacity, alleging that Custer illegally detained Adams and used excessive force against him in violation of the Fourth Amendment, and was deliberately indifferent to his serious medical needs in violation  of the Fourteenth Amendment (Counts 1, 2). Plaintiff also asserts that Custer's unreasonable use of deadly force constituted an intentional battery upon Adams, and that Custer's failure to personally render medical aid to Adams constituted negligence; on these twin grounds, plaintiff asserts state law wrongful death claims against both the Sheriff and Custer (Counts 3, 4).

In his current motion for summary judgment, Sgt. Custer contends he is entitled to judgment as a matter of law on the § 1983 claims because the evidence does not reasonably support an

inference that his conduct rose to the level of a constitutional violation under the Fourth or Fourteenth Amendments. Specifically, Custer contends that even if he was a trespasser on the "One Stop Garden Shop" property, Adams, having been advised that Custer was an on-duty law enforcement officer, had no right to choke him, and once he did, Custer had probable cause to arrest Adams for battery on law enforcement officer. When Adams ignored Custer's command to get to the ground and, instead, ran to reach inside his vehicle, Custer had a reasonable fear for his life and, therefore, was justified in using deadly force. Furthermore, Custer contends he is entitled to qualified immunity for any constitutional violations arising from his conduct. On the state law claims, Custer contends he acted in the course and scope of his employment at all material times and is therefore immune from personal liability under Fla. Stat. § 728.28 (9) (a).

The Sheriff contends he is entitled to judgment as a matter of law on the § 1983 claims because the record does not reasonably support a finding that Custer's conduct constituted a constitutional violation. Moreover, relying on the Supreme Court's decision in *Monell v. Dep't of Soc. Servs,* 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978), he asserts that there is no basis for imposition of municipal liability against him for that conduct under theories of unofficial custom (persistent and widespread practice), ratification, or failure to supervise and train. On the state law claims, the Sheriff contends he is immune from suit under § 728.28 (9) (a) under the doctrine of sovereign immunity because plaintiff alleges in her complaint that Custer acted outside the course and scope of his employment, or with bad faith and malicious motive, conduct which lies outside the boundaries of Florida's limited sovereign immunity waiver.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only where the movant shows that there is no genuine dispute as to any material fact, and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

In ruling on the motion, the court must review all evidence and factual inferences available from the evidence "in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)). Thus, "the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002)).

With specific regard to qualified immunity questions, the Court looks not at the facts which the parties might be able to prove at trial, but rather, whether certain given facts show a violation of clearly established law. *Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998) (quoting *Johnson v. Jones*, 515 U.S. 304 (1995)). The Court must resolve any factual disputes in favor of the plaintiff, and then decide whether the defendant is entitled to qualified immunity under that version of the facts. *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003).

In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that a court reviewing a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party, and must not invade

the jury's province by making credibility determinations or weighing the evidence, highlighting that in doing so the court is obligated to review the record as a whole, and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. Evidence favoring the non-movant should be credited, as should "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.*

*Reeves* is not interpreted to mean, conversely, that testimonial evidence coming from an interested witness, even if uncontradicted, must be disregarded at the summary judgment stage. *LaFrenier v. Kinirey*, 550 F.3d 166, 168 (1st Cir. 2008). Rather, it is generally acknowledged that courts should accept, for summary judgment purposes, the uncontradicted testimony of interested witnesses, unless that testimony is "inherently implausible." *Lauren W. v. DeFlaminis*, 480 F.3d 259 (3d Cir. 2007); *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851 (1st Cir. 2008); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893 (5th Cir. 2002).

Finally, inferences reasonably available from medical and forensic evidence may be used to show the existence of genuine issues of material fact. "Such inferences are often necessary when the plaintiff's sole eyewitness is dead... and cases may always be proven by circumstantial evidence where direct evidence is unavailable.*" Morrel v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003). "Were it otherwise, a plaintiff might never prevail on an excessive force claim where the victim is dead and the defendant-police officer is the sole living eyewitness." *See Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994), *cert. den.*, 513 U.S. 820 (1994)  (award of summary judgment to the defense in deadly force cases must be made with particular care where the officer defendant is the only witness left alive to testify).

## IV. CLAIMS

## A. SECTION 1983 FOURTH AMENDMENT CLAIMS - DEFENDANT CUSTER

Title 42, § 1983 of the United States Code provides a civil remedy for the deprivation of any rights, privileges, or immunities secured by the Constitution and federal laws by a person acting under color of statute, ordinance, regulation, custom or usage of any state, territory or the District of Columbia. Persons found to be in violation of this statute are liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. §1983. In this case, the Plaintiff seeks redress under §1983 claiming that Custer violated her son's Fourth Amendment right to be free of detention without probable cause, as well as his right to be free from excessive force in the conduct of effecting a detention or arrest. *Graham v. Connor*, 490 U.S. 386, 389, 109 S. Ct. 1865, 104 L. Ed.2d 443 (1989).

Under § 1983, government officials who have violated rights conferred by federal statutes or the Constitution may be sued in their individual capacities. However, public officials are ordinarily shielded from personal liability for discretionary actions undertaken during their employment under the concept of "qualified immunity," allowing public officials to carry out their jobs effectively without fear of a lawsuit. This doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986)), and balances two important interests: the need to  hold accountable a public official who has irresponsibly exercised his power and the obligation to protect from liability an official who has reasonably performed his duties. *Singletary v. Vargas*, 804 F.3d 1174 (11th Cir. 2015) (quoting *Pearson v.  Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

To invoke qualified immunity, Custer must show that he was acting within the scope of his discretionary authority when the injuries to Adams occurred. Discretionary authority in this specific context includes "all acts taken pursuant to the performance of the official's duties which are within the scope of his authority, including ministerial acts." *Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008); *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988).

The evidence regarding Custer's interface with other members of the PBSO TAC unit on the night of the shooting, his attire (including a TAC–logo t-shirt under his outer shirt, duty weapon holster and police ID badge clipped to his belt), and his use of a PBSO vehicle, cell phone and laptop, overwhelmingly point to the conclusion that Custer was on-duty and exercising his discretionary authority as a member of PBSO law enforcement during his encounter with Adams. The Court thus assumes, for summary judgment purposes, that Custer was acting in his discretionary authority at the time of the shooting.

With this predicate, the analysis turns to the issue of whether Custer is entitled to qualified immunity for alleged misconduct committed within the scope of that authority. Here, the burden is on Plaintiff to show that Custer does not merit qualified immunity because: (1) the facts, construed in Plaintiff's favor, show Custer violated Adams' constitutional rights, and (2) the law, at the time of the alleged misconduct, clearly established the unconstitutionality of that conduct. *McCullough v. Antolini,* 559 F.3d 1201 (11th Cir.2009); *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). On the second prong, an objective standard applies; an officer can be held liable only if the law so clearly established the wrongfulness of his conduct that any reasonable officer in his place would have understood that he was violating the Plaintiff's constitutional rights. *Plumhoff v. Rickard*, __ U.S. __, 134 S. Ct. 2012, 2023, 188 L. Ed. 21 1056 (2014).

1.  **DID CUSTER VIOLATE ADAMS' FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE "SEIZURE" BY USING EXCESSIVE FORCE?**

Plaintiff claims – regardless of whether there was probable cause to arrest Adams --- that Custer used excessive force when he shot and killed her son, in violation of Adams' Fourth Amendment right to be free from unreasonable seizure by use of excessive force. "[A]pprehension by the use of deadly force is a seizure ...." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985).

Under prevailing Supreme Court precedent, "all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989); *Crenshaw v. Lister*, 556 F.3d 1283 (11th Cir. 2009). This "reasonableness" inquiry requires courts to carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1871.

This analysis is not capable of precise definition or mechanical application, but "requires careful attention to the facts and circumstances of each particular case." *Graham* at 396. Reasonableness in this context depends on all circumstances relevant to an officer's decision to use force, *Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010), including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or others, and whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Crenshaw* at 1290. Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and

rapidly evolving- about the amount of force that is necessary in a particular situation." *Plumhoff,* 134 S. Ct. at 2020.

"As in other Fourth Amendment contexts ... the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham* at 397, 109 S. Ct. 1865. Thus, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*, citing *Scott v. United States,* 436 U.S. 128, 138, 98 S. Ct. 1717, 1723, 56 L. Ed. 2d 168 (1978).

The Court is therefore obligated to look at the underlying fact pattern from the perspective of a reasonable police officer on the scene with knowledge of the surrounding facts and circumstances, balancing the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate. *Morton v. Kirkwood,* 707 F.3d 1276, 1281 (2013). This evaluation must be made on a case by case basis, assuming "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Post v. City of Fort Lauderdale,* 7 F.3d 1552 (11th Cir. 1993) (quoting *Graham,* 490 U.S. at 396)).

An officer's use of deadly force is presumptively reasonable if the officer reasonably believes that the suspect poses a threat of serious harm to the officer or others, and the use of deadly force in this context does not violate the Constitution. *Tennessee v. Garner,* 471 U.S.1, 11, 105 S. Ct., 85 L.Ed.2d 1 (1985); *Carr v. Talangelo,* 338 F.3d 1259 (11th Cir. 2003); *Mace v City of Palestine,* 333 F.3d 621, 623 (5th Cir. 2003). This inquiry can be reduced to a single question: "Whether, given the circumstances, [the suspect] would have appeared to reasonable police offers to have been

gravely dangerous." *Penley v. Eslinger*, 605 F.3d 843 (11th Cir. 2010), citing *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002).

Relying on the reasonable inferences available from the forensic evidence, and resolving all conflicting evidence on material points in favor of Plaintiff, as more particularly discussed at Section I. D. "Factual Issues," above, the Court concludes there are genuine issues of material fact regarding the circumstances confronting Custer, which, if resolved by a jury against Custer, would allow the jury to find that Custer shot Adams when he was unarmed and empty-handed, standing behind the left rear tire of his pick-up truck and well away from any interior compartments of the vehicle.

That is, reasonable inferences from the evidence would permit a jury to find that Custer fired on an empty-handed, unarmed Adams standing behind or near the driver-side rear wheel of his pick-up truck, posing no threat of grave bodily harm to Custer or anyone else. Under this scenario, applying the objective standard for use of deadly force outlined above, the Court holds that use of such deadly force to stop or "seize" Adams would constitute excessive force, in violation of the Fourth Amendment's prohibition against "unreasonable seizure."

Finally, even assuming a jury were to accept the aspect of Custer's testimony describing a non-compliant Adams "fishing around" inside the door of his truck, ignoring Custer's commands to show his hands, and then suddenly breaking free and spinning out of the vehicle, there is still, crucially, evidence to support plaintiff's assertion that at the time Custer decided to shoot Adams, Adams had moved away from the door of the vehicle and was standing unarmed and empty-handed behind his pick-up truck, well out of reach of its interior compartments. Consequently, any earlier fear that Custer may have had when Adams was allegedly "fishing" around inside his truck had

been neutralized at the time of the first shot. In other words, any earlier resistance, aggression or furtive movements on the part of Adams would not legitimize Sgt. Custer's later decision to shoot him once the situation was neutralized. *See Montero v. Nkandla*, 597 Fed. Appx 1021 (11th Cir. 2014) (no objectively reasonable officer would shoot unarmed suspect lying prone and pinned to ground, regardless of any prior reasons for concern that the suspect may have been trying to reach the officer's gun during a physical scuffle in the handcuffing process).

Whether Custer's conduct in shooting Adams was reasonable depends on whether a reasonable officer in Custer's shoes would have believed that Adams was gravely dangerous to him *at the point in time* that Custer deployed deadly force. Both parties agree that this turns on a factual determination as to whether Custer fired his first shot as Adams was "fishing around" inside the interior compartment of the vehicle, and suddenly came "spinning out" toward Custer, breaking Custer's hold on his head – as contended by Custer – or whether Custer fired at an empty-handed, unarmed Adams standing behind or near the left rear wheel of the pick-up – as contended by plaintiff. Under the Plaintiff's version of the event, which finds evidentiary support in the summary judgment record, no reasonable officer in Custer's shoes could have believed Adams posed a grave danger at that juncture, and the use of deadly force against Adams in that posture would therefore be excessive and unconstitutional.

In reaching this conclusion, the Court emphasizes it is not making any judgment as to the ultimate facts, or the competence of Custer. Rather, the Court simply concludes, based on the current summary judgment record, it is not possible to declare the evidence so free from dispute that summary judgment can be entered for defendant. This follows, because, as the chronology outlined above indicates, there is a critical fact dispute as to whether Custer shot at a man who was

pinned the driver's side door and frame of his vehicle, "fishing around" inside in defiance of the officer's command to show his hands and get on the ground, or whether Custer shot an unarmed, empty-handed man standing behind the vehicle without access to any of its interior compartments. *See Jackson v. Holyman*, 933 F.2d 401, 403 (6th Cir. 1991) (summary judgment on a claim of excessive force is inappropriate where the parties' dispute virtually all of the essential facts surrounding the excessive force claim, because it is impossible to determine whether the force used was reasonable without choosing between the parties sharply different actual accounts).

### a.     WAS THE CONSTITUTIONAL RIGHT CLEARLY ESTABLISHED?

Even though a reasonable jury could find Sgt. Custer made an unreasonable "seizure" of Seth Adams by using deadly force against him in the course of a detention without legal justification, Custer may still claim qualified immunity if Adams' right to be free of such force was not "clearly established" at the time of the shooting.

For a right to be "clearly established," "the contours of the right must be sufficiently clear that reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987); *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508 (2002). In excessive force claims, plaintiff can establish the right was "clearly established" in two ways: (1) by citing controlling and materially similar case law declaring the official's conduct unconstitutional, or (2) by demonstrating that the official's conduct lies so obviously at the core of what the Fourth Amendment prohibits that the unlawfulness of the conduct should have been readily apparent to the official, notwithstanding the lack of case law. *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000). In this context, the "controlling and materially similar case law" must come from the Supreme Court of the United States, the Eleventh

Circuit Court of Appeals or the highest court of the State whose law is at issue. *Hamilton v. Cannon,* 80 F.3d 1525, 1531 (11th Cir. 1996).

Viewing the evidence in the light most favorable to Adams, Sgt. Custer intentionally fired four close range shots at an empty-handed Adams when he was standing well beyond reach of the interior compartment of his vehicle, and therefore, at a time when Adams posed no risk of harm to Custer. Under well-established Supreme Court and Eleventh Circuit precedent in effect at the time of this incident, no objectively reasonable officer in Custer's position could have believed that he was entitled to use deadly force to "seize" Adams in this scenario.

It was clearly established at the time of the shooting that it was a Fourth Amendment violation to seize an unarmed, non-dangerous civilian by shooting him dead. *Tennessee v. Garner,* 471 U.S. 1, 105 S. Ct. 1694 (1985); *Torres v. City of Madera,* 648 F.3d 1119 (9th Cir. 2011). Under *Garner,* Sgt. Custer would have been on clear notice that deadly force would be justified only if he had probable cause to believe Adams posed a threat of serious physical harm either to him or others. Under the most favorable view of the evidence to plaintiff, Adams did not pose such a grave danger.

Custer also had fair warning from Eleventh Circuit precedent that shooting an unarmed person who is not acting in manner posing a risk of great bodily harm to an officer violates the suspect's constitutional right to be free of excessive force. *See e.g. Mercado v. City of Orlando,* 407 F.3d 1152 (11th Cir. 2005) (use of deadly force to subdue subject in non-deadly situation violates detainee's clearly established Fourth Amendment rights); *Pruitt v. City of Montgomery,* 771 F.2d 1475, 1477 (11th Cir. 1985) (city held liable for officer's intentional firing at suspect's legs in attempt to stop suspect from fleeing alleged burglary site, despite refusal to obey order to halt, where there

was no evidence that suspect committed or threatened to commit crime involving infliction of serious physical harm); *Lundgren v. McDaniel*, 814 F.2d 600 (11th Cir. 1987) (affirming verdict in favor of suspect in burglary of video store who was shot by officers, where evidence, in light most favorable to plaintiff, showed that suspect did not reach for weapon, threaten officers or shoot at officers*); Vaughan v. Cox,* 343 F.3d 1323 (11th Cir. 2003) (shooting three shots into vehicle of auto thief suspects who were evading arrest and who had accelerated to eight to eighty-five miles in seventy mph zone held excessive).

In sum, under the most favorable view of the evidence to the Plaintiff, no objectively reasonable officer in Custer's position could have reasonably believed he was entitled to shoot Adams at the time and in the manner he did. Accordingly, Defendant Custer is not entitled to qualified immunity as a matter of law, and his motion for summary judgment based on this defense is appropriately denied. *See e.g. Caruthers v. McCawley*, 2008 WL 4613048 (M.D. Fla. 2008) (denying summary judgment in § 1983 excessive force claim where bank robbery suspect exited hotel with arms in air and announced he was unarmed, and officer shot him once in chest as he walked toward him, and three more times as he tried to run away).

## 2. DID CUSTER VIOLATE ADAMS' FOURTH AMENDMENT RIGHT TO BE FREE OF AN UNREASONABLE "SEIZURE" BY ARRESTING HIM WITHOUT PROBABLE CAUSE?

Under the Fourth Amendment, Adams had a constitutional right to be free from unreasonable seizure. A seizure occurs when "a person's freedom of movement is restrained by means of physical force or by submission to a show of authority," which includes an arrest or detention. *United States v. Allen*, 447 Fed. Appx. 118, 120 (11th Cir. 2011) (per curiam). An arrest, a complete seizure, must be supported by probable cause. *United States v. Blackley*, 439 Fed Appx. 803 (11th Cir. 2011) (per

curiam).  An arrest, or detention, without probable cause violates the Fourth Amendment, and is thus

an unconstitutional seizure.  *Redd v.  City of Enterprise*, 140 F.3d 1378  (11th Cir. 1998).

Probable cause  to arrest exists when an arrest is objectively reasonable  based on the totality

of the circumstances. *Durruthy v.  Pastor*, 351 F.3d 1080 (11th Cir. 2003).  This standard is met

where the facts and circumstances within the officer's knowledge, of which he or she has reasonably

trustworthy information, would cause a prudent person to believe, under the circumstances shown

that the suspect has committed is committing or is about to commit an offense.  Even if no probable

cause exists, officers making an arrest are entitled to qualified immunity so long as "arguable

probable  cause for the arrest" exists. *Durruthy*, at 1089.   This  means an officer has  qualified

immunity as long as he "reasonably could have believed that probable cause existed," in light of the

information he possessed, even if he was mistaken in that belief.

In this case, Custer contends he had actual or at least arguable probable cause to arrest Adams

for the crime of battery on a law enforcement officer, and that he was also entitled to use the force

necessary to effect such an arrest.  The elements of the crime of battery on a police officer under

Florida law consist of (1) knowingly (2) actually (3) intentionally (4) touching or striking (5) against

his  will (6)  a law enforcement officer  (7) engaged in the lawful performance of his duties.

*Mordica v. State*, 618 So.2d 301 (Fla. 1st DCA 1993). [8] This is a specific  intent crime and requires a

subjective intent to accomplish a statutorily prohibited result. *Id.* at 304.   That is, a conviction for

---

[8] Section 784.07(2), Florida Statutes, defines this crime as follows:

> Whenever any person is charged with knowingly committing an assault or battery upon a law
> enforcement officer. ... while the officer. .... is engaged in the lawful performance of his or her
> duties, the offense for which the person is charged shall be reclassified as follows:
> ...
> (b) in the case of battery, from a misdemeanor of the first degree to a felony of the third degree.

battery on a law enforcement officer requires proof of the specific intent of knowingly battering a law enforcement officer.

In this case, there are genuine issues of material fact which, if resolved by a jury against Custer, would allow the jury to find that Custer had neither probable cause nor arguable probable cause to arrest Adams. The sole basis for the attempted arrest of Adams is Custer's claim that Adams choked him, grabbing him as hard as a man could grab a person. The lack of corroborating physical evidence, coupled with other inconsistencies in Custer's testimony, would allow a jury to reject Custer's testimony in total on this point.

If Custer's testimony regarding the choking is disbelieved by the finder of fact, the primary elements of the crime did not exist, and Custer would have had no probable cause to arrest Adams for battery on a law enforcement officer. Further, a reasonable officer in Custer's position would have understood he was violating the Plaintiff's constitutional rights by attempting to detain him under those circumstances, i.e. declaring him under arrest and ordering him to the ground.

Thus, the Court finds sufficient evidence to raise genuine issues of material fact on the threshold question of whether Custer had "probable cause" to arrest or detain Adams for battery on a law enforcement officer, and whether he is entitled to qualified immunity for his conduct in placing Adams under arrest.

## B. FOURTEENTH AMENDMENT DUE PROCESS CLAIM – DEFENDANT CUSTER

The Due Process Clause of the Fourteenth Amendment requires government officials to provide adequate medical care to individuals injured while apprehended by police. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L.Ed.2d 605 (1983) ("[T]he due process rights of a [pre-trial detainee] are at least as great as the Eighth Amendment

31

protections available to a convicted prisoner); *Phillips v. Roane County, Tenn.,* 534 F.3d 531 (6th Cir. 2008). Claims alleging deliberate indifference to a pretrial detainee's serious medical needs are thus subject to same scrutiny as if brought as deliberate indifference claims under the Eighth Amendment. *Carter v. Broward County Sheriff's Dept. Medical Dept.,* 558 Fed. Appx. 919 (11th Cir. 2014).

To prevail on a deliberate indifference to serious medical need case under the Fourteenth Amendment, a plaintiff must show (1) a serious medical need (2) the defendant's deliberate indifference to that need and (3) causation between that indifference and the plaintiff's injury. *Mann v. Taser International, Inc.,* 588 F.3d 1291 (11th Cir. 2009). To constitute a "serious" medical need, it must be one if, left unattended, poses a substantial risk of serious harm.

A claim for deliberate indifference to serious medical needs has objective and subjective components. *Phillips v. Roane County, Tenn.,* 534 F.3d 531, 539 (6th Cir. 2008). The objective component requires showing the existence of a "sufficiently serious" medical need. *Phillips,* 534 F.3d at 539. To establish the subjective component, a plaintiff must allege and show facts which, if true, would show that the defendant subjectively perceived facts from which to infer substantial risk of harm; that he did in fact draw such an inference, and that he then disregarded that risk. *Comstock v McCrary,* 273 F.3d 693 (6th Cir. 2001). It is not necessary, however, to prove that the officer acted for "the very purpose of causing harm or with knowledge that harm will result," however. *Id.*

In this case, Custer knew that Adams was hit by gunfire and that he risked serious harm unless given immediate medical attention. However, there is no evidence that Custer was deliberately indifferent to Adams' medical needs by delaying his initial request for medical

assistance or in preventing other officers or medical responders from treating Adams immediately upon their arrival.  There is no dispute that Custer promptly  called for EMS back-up; defendants argue this is all that the Constitution requires.  Plaintiff argues that Custer had a constitutional duty to do more, and that, despite his own First Aid and CPR certifications,  Custer did not personally render medical assistance during the interval between the time he placed the call for medical back up and the arrival of the medics.

The Court does not find a disputed issue of genuine fact on whether Custer's conduct and failure to personally attend to Adams in this interval rose to level of constitutional deprivation.  As expressed by the Ninth Circuit in *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415  (9th Cir. 1986)(citations omitted):

> The due process clause requires responsible governments and their agents to secure medical care for persons who  have been injured while in police custody.  We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances.  Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been  injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital.

*Accord City of Revere,* 463 U.S. 239, 234-245 (1983) (government fulfilled constitutional obligation to provide medical care to persons injured by police while being apprehended by seeing that suspect was promptly taken to a hospital); *Tatum v. City of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) (police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not personally administer care).

Plaintiff does not identify any case law suggesting that personal medical attention is required by the Constitution.  Because the undisputed facts show that Custer did not violate the decedent's

right to medical care, the Court shall grant Custer's motion for summary judgment on the asserted Fourth Amendment Due Process violation. *See Mason v. Lafayette City-Parish Consol. Government*, ___ F.3d ___, 2015 WL 6988739 (5th Cir. Nov. 10, 2015) (officer's conduct did not rise to level of deliberate indifference when he called ambulance for suspect after shooting; decision to defer to other officers to attend suspect not fairly viewed as showing wanton disregard for serious medical needs); *Duenez v. City of Manteca*, 2013 WL 6816375 (E.D. Cal. 2013)[9]

## C.   SECTION 1983 FOURTH AMENDMENT CLAIM – DEFENDANT SHERIFF

As to the §1983 Fourth Amendment/excessive force claim against the Sheriff, the Plaintiff contends, first, that the Sheriff ratified the misconduct of Custer by failing to meaningfully investigate Adams' death or to discipline Custer for his misconduct in causing it. Alternatively, Plaintiff contends that the Sheriff's shoddy investigation of Adams' homicide is illustrative and part of a long-standing pattern of sham officer-involved shooting investigations, "whitewashing" and exonerations of officers involved in such episodes, a practice which effectively ratifies and encourages lawless behavior by deputy sheriffs with tacit assurances that the Sheriff will "watch their backs."

Second, the Plaintiff contends the Palm Beach County Sheriff's Office is responsible for Custer's constitutional violations because Custer's conduct is illustrative of a widespread PBSO custom and practice of using excessive force to make arrests. Third, Plaintiff contends the Sheriff is

---

[9] Even if plaintiff proffered enough testimony to raise a fact issue on whether Custer had a duty to do more to assist Adams during the interval between the shooting and the arrival of the medics, there is a further deficiency in plaintiff's proofs in that she has offered no evidence on causation. A district court may not grant summary judgment *sua sponte* on grounds not requested by the moving party, *Baker v. Metropolitan Life Ins. Co.*, 364 F.3d 624 (5th Cir. 2004); *Denney v. Steak N Shake Operations, Inc.*, 559 Fed Appx 485 (6th Cir. 2014) (reversing summary judgment entered on causation issue not raised in summary judgment motion), and, as the defendants did not identify the causation issue as a ground for summary judgment, the Court does not rely on this evidentiary lapse as the basis for its disposition of the due process 1983 claim, but simply highlights this further deficiency in the proofs to complete the analysis.

responsible for Custer's constitutional violations because he failed to properly train, supervise and discipline his officers in the use of deadly force, and was negligent in retention of Custer, who was not competent or psychologically fit to be entrusted with the use of deadly force. For example, Plaintiff contends that Custer had a history of poor performance evaluations, including a criticism that he had "difficulty assessing critical incidents and making sound decisions under pressure," yet he was authorized to work on stressful police surveillance operations where quick and sound judgment were essential to the competent performance of his duties.

On the defense, the Sheriff contends (1) he conducted an adequate investigation of Adams' death, which was also investigated by the Palm Beach County State Attorney's Office, and reviewed by Florida Department of Law Enforcement (FDLE), with all three offices finding sufficient facts to exonerate Custer from any wrongdoing; (2) there is no competent, relevant evidence of a history of shoddy investigations or "whitewashing" of fatal shootings by PBSO officers in general, or a poor investigation into the Adams' shooting in particular, which would sustain a "ratification" theory of *Monell* liability; (3) there is no evidence that the Sheriff, though his administration, ignored a widespread practice of use of unconstitutional levels of deadly force by his deputies, and thereby effectively adopted the misconduct as unofficial policy of the Department; (4) there is no evidence that the Sheriff, through his administration, was actively negligent in failing to adequately train, supervise and discipline his officers in use of deadly force in a manner causally related to Custer's alleged misconduct in this case; and (5) there is no evidence that Sheriff was actively negligent in the hiring and retention of deputies in a manner causally related to Custer's alleged

Under *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality or governmental employer like the Sheriff cannot be held liable under 42 U.S.C. §

1983 under a theory of *respondeat superior*, i.e. the Sheriff here cannot be held liable under § 1983 simply because one if his  agents or employees caused an injury in the line of duty, even a constitutional injury. *Id.*  at 691.  Rather, a governmental employer can be sued for damages under §1983 only when the action that is alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers," *or* the action is "visited pursuant to governmental 'custom,' even though such custom has not received formal approval through the body's official decision making channels." *Monell* at 690-91.

In other words, *Monell* imposes liability on municipalities and governmental employers for deprivations of constitutional rights only where the violation is visited pursuant to a municipal policy, whether that policy is officially promulgated or unofficially authorized by custom.  Further, the policy or custom must be "the moving force of the constitutional violation" in order to establish § 1983 liability of a governmental body, *Polk County v. Dodson*, 454 U.S. 312, 102 S. Ct. 445, 454, 70 L.Ed.2d 509 (1981), and the custom must be created by city "lawmakers or those whose edicts or acts may fairly be said to represent official policy." *Monell* at 694.

In this context, a longstanding practice or "custom" is one that is so "persistent and widespread" that it constitutes a  "permanent and well-settled" governmental policy. *Trevino v Gates*, 99 F.3d 911 (9th Cir. 1996). The essential theory is that a widespread practice of unconstitutional behavior is tantamount to an unofficial custom, practice or policy of the municipality. *Depew v. City of St. Mary's, Georgia*, 787 F.2d 1496 (11th Cir. 1986). In this case, the Sheriff seeks summary judgment on the Fourth Amendment excessive force claim arguing that  the Plaintiff has not adduced sufficient evidence to satisfy the requirements of *Monell.*

36

## 1. WIDESPREAD CUSTOM AND PRACTICE

To establish *Monell* liability on a "custom and practice" theory, the Plaintiff must demonstrate that the deputies' misconduct in using excessive force was so persistent and widespread in the department as to practically have the force of an official policy. In support of her "custom and practice" *Monell* claim, plaintiff has produced evidence that 149 citizen' complaints of excessive force were filed against PBSO officers between May 2007 and May 2012, including 27 officer-involved shootings in which 29 citizens were injured or killed.  Only one of these complaints was sustained after internal departmental investigation, that of Deputy Samuel Peixoto, who was found to have violated the PBSO Rules and Regulations, but only after he committed suicide.  Of the 27 officer-involved shootings, plaintiff relies on  four episodes involving shootings of unarmed citizens involved in minor law infractions  as  illustrative examples of unjustified use of deadly force which went undisciplined by the PBSO.

Plaintiff posits it is highly unlikely that only one officer-involved shooting out of twenty-seven resulted in a finding of officer culpability (after an officer suicide), coupled with the minute number of excessive force complaints resulting in officer discipline, implies  a practice or custom of letting incidents of excessive force go unpunished. The  Court, however, is unable to draw any probative value from these numbers as there is no statistical context or expert explanation of their meaning.  There is no way to know  whether the percentage of complaints resulting in discipline is an average number for a police force the size of the Palm Beach County Sheriff's Office, or whether it is small or excessive.  Without some way of comparing this to other similar-sized police departments, the Court cannot infer anything about the PBSO practices in the use of deadly force.

Notably,  the Plaintiff has produced very limited evidence regarding the factual background of the four officer-involved shooting cases.  She has filed internal investigation reports in two of the cases, and personnel complaint reports in two others.  She has not shown,  however, that the incidents giving rise to the complaints bear any factual similarity to the May 16, 2012 confrontation with her son. More importantly, the Plaintiff  has failed to produce evidence that the investigations into these complaints against other PBSO deputy sheriffs were in fact inadequate or incorrect. Further, Plaintiff has failed to offer any evidence tending to prove  the other shootings were, in fact unjustified or unconstitutional.

While, in theory, municipalities and governmental bodies may be liable under *Monell* based on historical evidence of prior complaints sufficient do demonstrate that the entities and their officials ignored police misconduct, *see e.g. Parrish v. Luckie,* 963 F.2d  201 (8th Cir. 1992) (department avoided, ignored and covered up complaints of physical and sexual misconduct); *Harris v. City of Pagedale*, 821 F.2d 499 (8th Cir. 1987),  the mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force. *Rogers v. City of Little Rock, Ark.,* 152 F.3d 790 (8th Cir. 1998).

Even if the Court were to assume, *arguendo,* that  the four isolated  shootings referenced by plaintiff did  involve  unconstitutional   use  of  excessive  force,  this  evidence  falls  far  short  of establishing a  pattern that is so  "obvious, flagrant, rampant and of continued duration" and that would establish a "causal connection" between actions of the Sheriff and the  alleged constitutional deprivations. *Hartley v. Parnell,*  193 F.3d 1263, 1269 (11th Cir. 1999) (quoting *Brown,* 193 F.3d at 671);  *Depew v. City of St Marys, Georgia,* 787 F.2d 1496 (11th Cir. 1986);  *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (eleven incidents held  insufficient of "support a pattern

of illegality in one of nations' largest cities and police force).

Without statistical context or expert explanation, the plaintiff's statistical evidence of prior police-involved shootings and complaints of excessive force is insufficient as a matter of law to sustain a custom and practice claim under *Monell* against the Sheriff.

## 2.  FAILURE TO TRAIN AND SUPERVISE

There are limited circumstances in which an allegation of failure to train can be a basis for 1983 liability. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989) To establish *Monell* liability on this theory, a plaintiff must show a municipality's failure to train its employees in a relevant respect is tantamount to "deliberate indifference to the rights of persons with whom the [untrained employees] will interact." *City of Canton,* at 388. "Deliberate indifference" sets  a high standard of fault, requiring proof that a municipal actor disregarded a known, obvious consequence of his action.

To show a "deliberate or conscious choice" tantamount to "deliberate indifference," a plaintiff must prevent evidence that the municipality knew of a need to train and/or supervise in a particular practice yet  made a deliberate choice not to take any action. *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998).  To impute such knowledge,  a plaintiff must show a pattern of similar constitutional violations by untrained employees in order to demonstrate deliberate indifference for purpose of a failure to train claim. *Connick v. Thompson,* 563 U.S. 51, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011).

In the latter instance, "deliberate indifference" is determined by analyzing whether the municipality knew or reasonably should have known of the risk of constitutional violations,  which knowledge may be imputed through a pattern of prior constitutional violations. *Young v. City of*

*Providence  ex rel.  Napolitano*, 404 F.3d  4 (1st Cir. 2005).   The  inquiry thus turns on whether the municipality or governmental body  knew or should have known of the risk of constitutional violations, but did not act. This is an objective standard, but involves more than mere negligence. It does not require a municipality to take reasonable care to discover and prevent constitutional violations. It means simply that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, a municipality may not adopt a policy of inaction. *See Warren v. District of Columbia*, 353 F.3d 36 (D. C. Cir. 2004), citing *Farmer v. Brennan*, 511 U.S. 825, 841, 114 S. Ct. 1970, 1981, 128 L.Ed.2d 811 (1994).

In this case, the Plaintiff fails to identify a  genuine issue of fact on the issue of whether the Sheriff knew of, and was deliberately indifferent to, a need to train based on a pattern of similar constitutional violations to that alleged here.  Plaintiff relies on four officer-involved shootings of unarmed civilians from 2007 to 2012 to establish the Sheriff's knowledge of a need to train.  As noted above,  even assuming the existence of these events, Plaintiff  does not adduce evidence suggesting that these shootings were deemed unjustified, unconstitutional  or were anything other than legitimate  self-defense shootings.

With no other evidence of history of widespread prior abuse by PBSO personnel that would have put the Sheriff on notice of the need for improved training or supervision, no reasonable trier of fact could conclude that the alleged constitutional violations in this case were  caused by the Sheriff's failure to train its officers in the use of deadly force. *Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007), *cert. den.* 128 S. Ct. 654 (2007); *Joines v. Township of Ridley*, 229 Fed. Appx. 161 (3d Cir. 2007); *Wright v. Sheppard*, 919 F.2d 665 (11th Cir. 1990); *Popham v. City of Talladega*, 908 F.2d 1561 (11th Cir. 1990); *Whitaker v. Miami-Dade County*, ___ F. Supp. 3d ___, 2015 WL

5155251 (S.D. Fla. 2015). The Court shall accordingly grant the Sheriff's motion for summary judgment on the *Monell* failure to train theory. *See generally Board of County Commissioners of Bryan County, Okla. v. Brown,* 520 U.S. 397, 117 S. Ct. 1382, 137 L.Ed.2d 626 (1997); *Graham v. Sauk Prairie Police Commission,* 915 F.2d 1085 (7th Cir. 1990); *Gonzalez v. Ysleta Independent School Dist.,* 996 F.2d 745 (5th Cir. 1993).

### 3. RATIFICATION

Finally, plaintiff asserts that the Sheriff ratified Custer's misconduct in this case by failing to correct it, failing to adequately investigate the shooting, and failing to take appropriate disciplinary action against Custer. Even if the court assumes as true that there were shortcomings in the Sheriff's investigation of Adams' death, this does not mean the Sheriff can be liable under a ratification theory. The Sheriff must "cause" the violation in order to establish §1983 liability, and his failure to investigate the Adams incident could not have "caused," it unless there is some evidence that relevant decision-makers had an opportunity to review Custer's decision to use excessive force, and agreed with the decision and its basis before it became final. *Salvato v. Miley,* 790 F.3d 1286 (11th Cir. 2015). Clearly, there is no evidence that the Sheriff "reviewed" any part of Custer's actions "before they became final," much less any suggestion the Sheriff "approved" the decision to use deadly force and basis for it. Without such evidence, the Sheriff cannot be held liable under § 1983 on a "ratification" theory based on a single deficient investigation.

While liability on a "ratification" theory might alternatively be premised on the Sheriff's consistent, historical failure to adequately investigate police misconduct, to succeed on such a theory the Plaintiff would have to show that the Sheriff failed to adequately and correctly investigate numerous prior similar incidents, and routinely exonerated his deputies in "whitewashed" internal

41

investigations in a manner which would create an atmosphere of complacency in the force, and encourage officers under his command to use excessive force without fear of repercussion. *Vann v City of New York*, 72 F.3d 1040 (2d Cir. 1995); *Fiacco v. City of Rensselaer, New York*, 783 F.2d 319 (2d Cir. 1986), *cert. den.*, 480 U.S. 922 (1987).

As noted above, in relation to the "custom and practice" discussion, the Plaintiff does not adduce evidence showing material shortcomings in numerous prior investigations similar to the incident in question which would support the finding that there is a pattern of unjustified civilian deaths in officer-involved shootings which goes unpunished at the PBSO. This same evidentiary deficiency prompts the Court to conclude there is no plausible basis on which a fact finder could conclude that a history of deficient investigations into excessive force complaints in any way "ratified" the misconduct, or was a moving force behind the alleged unconstitutional conduct in this case.

Accordingly, the court finds insufficient evidence to raise a genuine issue of fact on the question of whether Sheriff "ratified" the historical use of excessive force by his deputies in a manner which was "moving force" behind the constitutional deprivation alleged, and shall grant the Sheriff's motion for summary judgment on the "ratification" prong of Plaintiff's *Monell* theories

## D. WRONGFUL DEATH CLAIMS

Plaintiff also alleges that Officer Custer is liable under Florida's wrongful death statute for the same "intentional and negligent" misconduct giving rise to her constitutional claims (excessive force, failure to render aid).

With regard to the alleged negligence based on Custer's failure to personally render aid to the gravely-wounded Adams, the Court shall grant summary judgment based on plaintiff's inability to

identify the existence of a duty to render personal aid in the first instance, and for failure to adduce any evidence on the element of causation, i.e. how Custer's alleged inaction in any way contributed to the extent of Adams' injuries.

With regard to the intentional misconduct alleged, although the complaint does not identify the specific tort for which the Plaintiff seeks to hold Custer liable, the Court interprets the "excessive force" allegations as the equivalent of a state law "battery."

In Florida, the tort of battery consists of "the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Quilling v. Price*, 894 So.2d 1061, 1063 (Fla. 5th DCA 2005). In the context of contact made by a police officer, slightly different principles apply:

> Traditionally, a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damage sonly where the force used is clearly excessive…If excessive force is sued in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery…

> A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances… Law enforcement officers are provided a complete defense to an excessive use of force claim where an officer "reasonably believes [the force] to be necessary to defendant himself or another from bodily harm while making the arrest…."

*City of Miami v. Sanders*, 672 So.2d 46, 47 (Fla. 3d DCA), *rev. den.*, 683 So.2d 484 (Fla. 1996). *See also Gomez v. Lozano*, 839 F. Supp. 2d 1309 (S.D. Fla. 2012).

On the state law claims, Custer argues first, that he was justified in the use of deadly force under the circumstances presented, and second, that he is in any event immune from liability because the conduct alleged is outside the limited waiver of sovereign immunity provided by Florida Statutes. In this respect, plaintiff's complaint alleges that Custer's "willful, wanton, intentional inappropriate unwarranted and unjustified excessive use of deadly force" caused the death of Adams

43

[Complaint, para. 40 ], and that the death was proximate result of Custer's "misconduct" which was "committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property." [Complaint, para. 74].

Under §768.28(9)(a), Florida's waiver of sovereign immunity does not apply to, and governmental *employees* may be personally liable for, acts beyond the scope of their duties, committed in bad faith or with malicious purpose, or that exhibited wanton and willful disregard of human rights, safety or property. This exception to the waiver must be read together with the general waiver statute, which states simply that a governmental *agency* is liable for:

> the negligent or wrongful act or omissions of any employee of the agency or subdivision while acting within the scope of his office or employment under circumstances in which the state or such agency or subdivisions, if a private person, would be liable to the claimant.

§768.28(1), Fla. Stat. (2013).

In this case, a question arises as to whether the allegations against Custer, if true, constituted conduct following outside the waiver of liability. If they did, Custer may be liable, but not the Sheriff. If they did not, Custer would be immune, but the Sheriff may incur liability.

Conduct is considered within the scope of employment, in context of this statute, "if it occurs substantially within authorized time and space limits," and is "activated at least in part by a purpose to serve the master." It is the purpose of the employee's act, as opposed to the method of performance, which controls the inquiry. *Hennagan v. Dep't. of Highway Safety & Motor Vehicles*, 467 So.2d 748 (Fla. 1st DCA 1985). In a situation where a police offer has allegedly used excessive force in committing a false arrest, the acts of the officer are not deemed to fall beyond the scope of the officer's employment merely because they are intentional. *Richardson v. City of Pompano Beach*, 511 So.2d 1121 (Fla. 4th DCA 1987), *rev. den.*, 519 So.2d 986 (Fla. 1988).

In this case, the record reveals genuine issues of material fact on question of whether Custer acted in bad faith, with malicious purpose, or in manner which exhibits wanton or willful disregard of human rights, safety or property, or whether he acted outside scope of his employment, and the fact that he may have used unreasonable excessive force in his encounter with Adams does not necessarily mean his conduct rose to this level.

A jury question also presents as to whether the Sheriff may be liable for alleged misconduct of Custer in the use of excessive force. The Sheriff is immune as a matter of law only if the acts are so extreme as to constitute "a clearly unlawful usurpation of authority [Custer] [did not] rightfully possess," or if there was "not even a pretense of lawful right in the performance of the acts. *McGhee v. Volusia County*, 679 So.2d 729 (Fla. 1996), citing *Craft v. John Sirounis & Sons, Inc.*, 575 So.2d 795 (Fla. 4th DCA 1991). The Court is unable to make that determination on the current record.

Although the plaintiff's complaint, concededly, contains allegations that place Custer's conduct in the realm of conduct beyond that for which the Sheriff may be liable under the limited sovereign immunity waiver, the Court will allow the plaintiff to amend her complaint, by interlineation, to alternatively allege the state of mind with which Custer conducted himself. From there, it will be for a jury to determine whether Custer acted with malicious intent or motive that excuses the Sheriff from liability, but exposes Custer to liability, or whether he acted with neutral intent that allows him to claim state agent immunity, but exposes the Sheriff under the limited sovereign immunity waiver set forth under Florida Statutes.

## V. CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1. Defendant Custer's motion for summary judgment on Plaintiff's §1983 Fourth Amendment claims (unlawful detention and excessive force) is **DENIED.**

2. Defendant Custer's motion for summary judgment on Plaintiff's §1983 Fourteenth Amendment due process claim (failure to render medical aid) is **GRANTED**.

3. Defendant Custer's motion for summary judgment on the state law wrongful death claim is **DENIED** to the extent premised on a state law battery claim (Count 4), and **GRANTED** to the extent based on a state law failure to aid negligence claim.

4. Defendant Sheriff's motion for summary judgment on Plaintiff's § 1983 *Monell* claims, predicated on alleged Fourth Amendment and Fourteenth violations allegedly committed by defendant Custer, is **GRANTED.**

5. Defendant Sheriff's motion for summary judgment on Plaintiff's state law wrongful death claim is **DENIED** to the extent premised on a state law battery claim, and **GRANTED** to the extent based on state law failure to aid negligence claim.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Florida this _12_ day of January, 2016.

Daniel T. K. Hurley
United States District Judge